**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |  |
|---|---|---|
| | : | |
| TYE THOMAS, | : | CIVIL ACTION NO. |
|     Plaintiff, | : | 3:13-CV-747 (JCH) |
| | : | |
|     v. | : | |
| | : | |
| DAVE BUTKIEWICUS et al., | : | |
|     Defendants. | : | APRIL 29, 2016 |
| | : | |

**RULING RE: PLAINTIFF'S MOTION FOR SANCTIONS (DOC. NO. 97)**

**I.    INTRODUCTION**

On May 23, 2013, plaintiff Tye Thomas ("Thomas"), acting pro se, filed this civil

rights action against the defendants, all of whom are employees or former employees of

the Connecticut Department of Correction ("DOC"), for failing to protect him from assault

by other inmates.  See Compl. (Doc. No. 1).  After several rounds of preliminary review

and rulings on dispositive motions, on January 20, 2015, the court appointed counsel to

represent Thomas at trial.  See Order Appointing Pro Bono Counsel (Doc. No. 58).

Throughout 2015, Thomas, acting through appointed counsel, conducted additional

discovery related to this lawsuit.  See Joint Mot. to Extend Time for Completing

Discovery (Doc. No. 68)  The discovery period in this case closed on September 11,

2015. See Order (Doc. No. 69).

On February 11, 2016, Thomas filed the pending Motion for Sanctions, which

seeks to remedy the defendants' alleged spoliation of key video evidence.  See Pl.'s

Mot. for Sanctions at 1 (Doc. No. 97).  Specifically, Thomas seeks an adverse inference

1

instruction related to the fact that security surveillance footage[1] that recorded assaults

on Thomas by other inmates at various times in 2012 was not preserved.  See id.  The

defendants opposed Thomas's Motion for Sanctions, see Defs.' Suppl. Mem. in Opp. to

Pl.'s Mot. for Sanctions and in Supp. of Mot. for Evidentiary Hr'g ("Defs.' Opp.") (Doc.

No. 116), and also moved for an evidentiary hearing to address the issues raised in

Thomas's Motion, see Defs.' Mot. for Evidentiary Hr'g (Doc. No. 105).  Thomas timely

replied to the defendants' Opposition and argued that an evidentiary hearing on his

Motion for Sanctions was unnecessary.  See Reply Mem. in Supp. of Pl.'s Mot. for

Sanctions ("Pl.'s Reply") at 10 n.5 (Doc. No. 118).

The court granted the defendants' Motion, over objection, and held an evidentiary

hearing on Thomas's Motion for Sanctions on April 12, 2016.  See Minute Entry (Doc.

No. 124).  Having carefully reviewed and considered the arguments and evidence

submitted by the parties, for the reasons that follow the court **GRANTS IN PART** and

**DENIES IN PART** Thomas's Motion for Sanctions (Doc. No. 97).

## II.    FACTUAL BACKGROUND

As noted above, this civil rights lawsuit stems from Thomas's contention that the

---

[1] With respect to any given incident at Northern Correctional Institution ("Northern"), there are potentially two kinds of video footage that could have been preserved and produced.  The first kind of video footage is recorded by the stationary surveillance system maintained by Northern.  The second kind of footage is recorded by hand-held cameras operated by correctional officers, which are used to record the aftermath of incidents like altercations between inmates.  See, e.g., Mem. in Supp. of Pl.'s Mot. for Sanctions at 7 (Doc. No. 97-1).  Thomas's Motion for Sanctions concerns only the first kind of video footage, i.e., any video footage captured by the stationary surveillance system at Northern.  See Pl.'s Mot. for Sanctions (Doc. No. 97) (referring to the destruction of "certain security surveillance footage"); Mem. in Supp. of Pl.'s Mot. for Sanctions at 2-3, 7 (Doc. No. 97-1) (describing the missing evidence as "video surveillance evidence," contrasting the missing evidence to video captured by "hand-held video cameras," and indicating that 13 videos from hand-held cameras were saved and have been produced to Thomas).  Thus, for purposes of this Ruling, when the court refers to "video footage," or "the missing videos," the court is referring exclusively to video footage that would have been captured by the stationary surveillance system at Northern.

defendants, David Butkiewicus ("Butkiewicus"), Scott Gorman ("Gorman"), John Aldi ("Aldi"), and Edward Maldonado ("Maldonado") (collectively, "the defendants"), all employees or former employees of the Connecticut DOC, were deliberately indifferent to threats to his safety and failed to protect him from assault by other inmates.  In particular, Thomas alleges that the defendants forced Thomas to remain in the Security Risk Group Unit ("SRG Unit") for inmates affiliated with the Bloods gang notwithstanding the fact that the defendants were aware that Thomas had switched his allegiance to the rival Crips gang.  See Compl. at 12 ¶¶ 1-10 (Doc. No. 1); see also Mem. in Supp. of Pl.'s Mot. for Sanctions at 1 (Doc. No. 97-1).  During the course of 2012, Thomas was assaulted six different times by members of the Bloods, on January 18, April 16, July 3, July 20, September 18, and October 11.  See Compl. at 12 ¶¶ 2, 5, 7, 9 (Doc. No. 1); DOC Incident Report dated 1/18/2012 ("1/18/2012 Incident Report") (Doc. No. 97-2, Ex. F); DOC Incident Report dated 4/16/2012 ("4/16/2012 Incident Report") (Doc. No. 97-2, Ex. G); DOC Incident Report dated 7/3/2012 ("7/3/2012 Incident Report") (Doc. No. 97-2, Ex. I); DOC Incident Report dated 7/20/2012 ("7/20/2012 Incident Report") (Doc. No. 97-2, Ex. J); DOC Incident Report dated 9/18/2012 ("9/18/2012 Incident Report") (Doc. No. 97-2, Ex. K); DOC Incident Report dated 10/11/2012 ("10/11/2012 Incident Report") (Doc. No. 97-2, Ex. L).

Of the six assaults on Thomas by other inmates, three took place in a recreation ("rec") yard during the hour of each day allotted to inmates for recreation.  See 1/18/2012 Incident Report (Doc. No. 97-2, Ex. F); 9/18/2012 Incident Report (Doc. No. 97-2, Ex. K); 10/11/2012 Incident Report (Doc. No. 97-2, Ex. L); see also Compl. at 12 ¶¶ 2, 7, 9 (Doc. No. 1).  The other three incidents took place in housing unit cells.  See

4/16/2012 Incident Report (Doc. No. 97-2, Ex. G); 7/3/2012 Incident Report (Doc. No. 97-2, Ex. I); 7/20/2012 Incident Report (Doc. No. 97-2, Ex. J); see also Compl. at 12 ¶ 5 (Doc. No. 1).  The court will briefly describe each assault in turn.

The January 18, 2012, incident took place in the North recreation yard of the 2 East housing unit.  See 1/18/2012 Incident Report (Doc. No. 97-2, Ex. F); Compl. at 12 ¶ 2 (Doc. No. 1).  Thomas alleges that, immediately after he joined the Crips, two inmates affiliated with the Bloods assaulted him and another inmate, Mitchell Ellerbe ("Ellerbe"), who was associated with a gang called 20 Love.  See Compl. at 12 ¶ 2 (Doc. No. 1).  Thomas states that people affiliated with the Crips and 20 Love are compatible, and that both groups have issues with the Bloods.  Id. at 12 ¶ 3.  The Incident Report for this altercation indicates that another inmate kicked Thomas, at which point Ellerbe attempted to come to Thomas's aid.  See 1/18/2012 Incident Report (Doc. No. 97-2, Ex. F).  During the altercation, Ellerbe managed to free one of his hands from the handcuffs that restrained his hands behind his back; he also admitted later to having had possession of a "makeshift weapon" that was found in the recreation yard following the incident.  Id. at 1, 2.  Ellerbe told Butkiewicus, who investigated the incident, that "he was friendly with inmate Thomas and acted out in an attempt to help him."  Id. at 2. There does not appear to be any question that this incident would have been captured by the stationary video surveillance system at Northern, see id. at 1 (noting that Butkiewicus reviewed the "facility camera system" as part of his investigation").  Thomas alleges that immediately after this altercation, he told Maldonado, then the Warden of Northern, that "he was no longer a Blood and wanted his affiliation changed to Crip." Compl. at 12 ¶ 4 (Doc. No. 1).

4

The incident on April 16, 2012 took place in a cell in a housing unit.  See 4/16/2012 Incident Report (Doc. No. 97-2, Ex. G); Compl. at 12 ¶ 5 (Doc. No. 1).  Thomas alleges that his cellmate assaulted him for "dropping his flag and joining the Crip affiliation."  Compl. at 12 ¶ 5 (Doc. No. 1).  Although the door of the cell in which this altercation took place was very likely within range of a stationary surveillance video camera, see Dep. of David Butkiewicus at 154 (Doc. No. 97-2, Ex. B) (stating that most cells are within range of a surveillance camera), at the hearing on the pending Motion Butkiewicus testified that the surveillance cameras do not capture what is going on inside a cell at a given time, as the cell doors are made of steel and the surveillance system does not allow staff members to see through the steel door to the interior of the cell.  Thomas alleges that, two days after this altercation took place, he wrote to Maldonado "and informed the Warden of his no longer being a Blood, but that he was a Crip formally and requested a[n] affiliation and rec change because he feared for his safety."  Compl. at 12 ¶ 6 (Doc. No. 1).

The incidents on July 3 and July 20 also took place in cells in a housing unit at Northern.  See 7/3/2012 Incident Report (Doc. No. 97-2, Ex. I); 7/20/2012 Incident Report (Doc. No. 97-2, Ex. J); Compl. at 15 ¶ 17 (Doc. No. 1).  Both incidents involved an altercation between Thomas and his cellmate and, according to the Incident Reports related to these altercations, both of Thomas's cellmates were affiliated with the Bloods.  See 7/3/2012 Incident Report (Doc. No. 97-2, Ex. I) (noting that the inmate who fought with Thomas was "Otero, Elliot . . . SRG Blood Threat"); 7/20/2012 Incident Report (Doc. No. 97-2, Ex. J) (stating that the inmate who fought with Thomas was Jonathan King, an inmate "affiliated with the Bloods Security Risk Group").  As with the April 16

incident, because these altercations took place inside housing cells, the stationary surveillance cameras at Northern would not have captured footage of either of these fights.

The incident on September 18, 2012, took place in the South recreation yard of the 2 East housing unit.  See 9/18/2012 Incident Report (Doc. No. 97-2, Ex. K); Compl. at 13 ¶ 7 (Doc. No. 1).  The parties agree that, during an hour-long recreation period on that day, five inmates affiliated with the Bloods attacked Thomas.  See 9/18/2012 Incident Report (Doc. No. 97-2, Ex. K); Compl. at 13 ¶ 7 (Doc. No. 1).  Two of the inmates who attacked Thomas were able to remove their handcuffs prior to the assault and, following the altercation, one of these inmates, Luis Pagan ("Pagan"), was found to have a "makeshift weapon . . . on his person."  9/18/2012 Incident Report (Doc. No. 97-2, Ex. K).

In a subsequent deposition, Pagan testified that he was able to remove his handcuffs because the correctional officer who had restrained him prior to the recreation period, defendant Gorman, had intentionally placed the restraints on loosely.  See Dep. of Luis Pagan at 42 (Doc. No. 97-2, Ex. A).  Pagan also testified that the other inmate who was able to slip out of his restraints, Teejay Johnson ("Johnson"), was able to do so because he had an Ace bandage wrapped around his wrist, which increased the circumference of his wrist and necessitated the restraints being applied more loosely. See id. at 42-43.  Once Johnson was in the recreation yard, he was able to remove the Ace bandage and then slip out of the restraints.  See id.  Pagan alleged that Gorman was not supposed to place Johnson's restraints over the Ace bandage, because Johnson did not have medical clearance to possess the bandage and there had been

6

prior incidents of inmates using bandages to help them slip out of their restraints.  See id. at 43-44.  Pagan alleged that Gorman allowed Johnson to possess the bandage and applied Pagan's restraints more loosely than normal because he knew that Pagan and Johnson were planning to assault Thomas.  See id. at 41-43.

Finally, and perhaps most crucially for the pending Motion, Pagan testified that, early in the recreation period, he showed Thomas his hands to let Thomas know that Pagan had slipped his restraints.  See id. at 27-28.  Pagan testified that he showed Thomas his hands in order to instill a false sense of security in Thomas; in Pagan's words, he wanted to show Thomas that "I could fuck you up right now, but I'm not going to do that, we're out here to talk.  We were trying to rock him to sleep, make them feel comfortable."  See id.  Although Pagan asserts that he was in the middle of the recreation yard when he showed Thomas his hands—in full view of both the correctional officer monitoring the recreation period and the stationary surveillance camera capturing events in the recreation yard—no correctional officers intervened or otherwise attempted to re-restrain Pagan.  See id. at 27-28, 50.  Pagan estimates that he was unrestrained for approximately 40 minutes prior to the assault on Thomas.  See id. at 50.

The parties agree that the September 18 incident in the South recreation yard would have been captured by the surveillance camera[2] trained on the yard and, in fact, some of the footage captured by that camera was preserved.  Thomas alleges that, after this altercation, he "verbally requested a[n] affiliation change to Captain

_____

[2] This is the only video footage from stationary surveillance cameras that was preserved and produced in this case.  See Mem. in Supp. of Pl.'s Mot. for Sanctions at 7 (Doc. No. 97-1).

Butkiewicus during a routine tour."  Compl. at 13 ¶ 8 (Doc. No. 1).  Thomas states that Butkiewicus denied his request, but did permit Thomas to stop recreating with the Bloods.  See id.

The final altercation at issue in the pending Motion took place on October 11, 2012.  See 10/11/2012 Incident Report (Doc. No. 97-2, Ex. L).  Although Thomas was no longer recreating with the Bloods, he states that he was forced to recreate with an inmate who wanted to gain membership in the Bloods.  See Compl. at 13 ¶ 9 (Doc. No. 1).  At his deposition, Pagan confirmed that the inmate who assaulted Thomas on October 11 wanted to join the Bloods, and that Pagan and others exploited this fact to orchestrate an attack on Thomas.  See Dep. of Luis Pagan at 52-53 (Doc. No. 97-2, Ex. A).  The inmate who attacked Thomas on October 11 was also able to free himself from his restraints, at which point the inmate "str[uck] Thomas repeatedly on the head, face and upper torso."  10/11/2012 Incident Report (Doc. No. 97-2, Ex. L).  This altercation took place in the same recreation yard as the altercation on September 18, which means the parties agree that at least one, and possibly two, surveillance cameras would have captured footage of the assault.  It is not disputed that the surveillance footage of this assault was not preserved.  Shortly after the incident on October 11, 2012, Thomas filed grievances related to the fact that inmates who assaulted him on both September 18 and October 11 had managed to slip out of their restraints during the altercations.[3]

---

[3] Despite the fact that Thomas clearly stated in these grievances that he was concerned that other inmates had been able to get out of their restraints and that he would "like Warden Maldonado to enforce DOC policy" on that point, Maldonado curiously interpreted Thomas's grievances as a request to lift the policy of restraining inmates during recreation.  Thus, Maldonado denied Thomas's grievances on the grounds that "the Restraint Policy has been reviewed and will remain in place."  DOC Inmate Administrative Remedy Forms at 2 (Doc. No. 97-2, Ex. Q).

See DOC Inmate Administrative Remedy Forms (Doc. No. 97-2, Ex. Q) (dated 10/17/2012 and advising Maldonado that during the altercations on 9/18/2012 and 10/11/2012 "other inmates had manage[d] to get out of there [sic] cuffs").

    With this overview of the altercations at issue in this case as background, the court now turns to a summary of the evidence that has been presented by the parties regarding the policies and practices of the DOC and various DOC employees with respect to reviewing and preserving surveillance footage of inmate altercations.  Both parties tend to use the incident on September 18, 2012, as a concrete example of an altercation around which they can frame their inquiries into DOC policies and the routine practices of DOC employees.  This is likely due to the fact that, as noted above, the September 18 altercation is the only incident for which any surveillance footage was produced.  Thus, an overview of the video footage related to the incident on September 18 that was—and was not—preserved is an appropriate place for the court to begin its summary of the evidence provided by the parties on these issues.[4]

    The surveillance video of the altercation between Thomas and five other inmates on September 18, 2012, that was preserved and produced is one hour in length, but it does not capture the entire hour of recreation in the South recreation yard on that day.  Rather, the video begins with inmates already in the yard, as the hour of recreation is drawing to a close, approximately eight minutes prior to the assault on Thomas.  The preserved video captures all of the actual assault, as well as the efforts of correctional

_____

    [4] The parties submitted the video of the September 18, 2012, incident in advance of trial, and the court reviewed the video in its entirety for purposes of this Ruling.  See NCI 12-1830 (surveillance video of inmate altercation in the South recreation yard on September 18, 2012).

officers to subdue the inmates and clear the yard.  After these efforts are complete,

there is an additional 30 minutes of footage of the empty yard in which virtually nothing

happens.  Approximately 30 minutes of the recreation period that took place prior to the

assault was not preserved.  See Decl. of Paul Germond ("Germond Decl.") at 2 ¶ 5

(Doc. No. 116-2) (stating that he did not download and preserve the first 30-40 minutes

of the recreation period).  In addition, video captured by a different camera that had a

partial view of events in the recreation yard,[5] as well as video from cameras trained on

housing unit cells that would have captured correctional officers searching the clothing

of, and restraining, the inmates who attacked Thomas prior to the recreation period, was

not preserved.  See Mem. in Supp. of Pl.'s Mot. for Sanctions at 8 & n.2 (Doc. No. 97-

1).

Although only a few minutes of the recreation period prior to the assault on

September 18, 2012, as captured by the camera trained on the South recreation yard

were preserved and produced, at the hearing on the pending Motion multiple

defendants and a non-defendant DOC employee testified that they either could have or

routinely would have reviewed all of the video relevant to an incident and would have

_____

[5] This video footage would have been captured by a camera inside Northern that was trained on
a Multipurpose Room that correctional officers used as a vantage point for monitoring recreation in the
South yard.  Although no footage captured by this camera of the September 18 or October 11 altercations
was preserved, at the hearing on the pending Motion the defendants did provide sample footage of the
view of this camera.  See Marked Exhibit-Witness List (Doc. No. 123) (stating that the court viewed
footage from camera 139, which videos were marked as defendants' exhibits 102 and 103).  The sample
surveillance footage shows that the wall shared by the recreation yard and the Multipurpose Room is
made of glass, which means that the interior camera is able to see through the Multipurpose Room to the
recreation yard beyond.  The view of the recreation yard from this interior camera is partial and
undoubtedly inferior in terms of quality and percentage of the recreation yard visible to footage captured
by the camera that is directly trained on the recreation yard, but the court nonetheless finds that the
interior camera could have captured relevant footage of incidents that took place in the South recreation
yard, and relevant footage of correctional officers monitoring the recreation period.

had the capacity to preserve that footage.  For example, Paul Germond, then a correctional lieutenant at Northern who supervised the institutional response to the September 18 altercation, was the DOC employee who initially "review[ed] the stationary video camera recording of the incident and identif[ied] those parts of it that contain[ed] evidentiary value."  Germond Decl. at 2 ¶ 5 (Doc. No. 116-2).  Germond testified that his routine practice[6] in responding to an incident would have been to review the video of the entire recreation period prior to downloading and preserving the portions of the video footage he deemed to be relevant.  See id. at 2 ¶¶ 5-6.  Germond and Butkiewicus testified that Germond completed his supervisory duties with respect to Northern's response to the altercation of September 18, 2012, on that same day, at which point he tendered the investigation to Butkiewicus.[7]

Butkiewicus testified that, after the investigation was turned over to him on September 18, 2012, he also had the capacity to preserve additional video footage if he deemed it necessary.  In fact, at his Deposition Butkiewicus attested that it was his routine practice to review any video footage that may have been relevant to an incident he was investigating, and that adherence to his routine practice in this case would have allowed him to conclude, as he does in the Incident Report for the September 18 altercation, that all "staff acted professional [sic] and in accordance with all governing directives, policies, and procedures."  9/18/2012 Incident Report (Doc. No. 97-2, Ex. K);

―――――――――――――――――

[6] At the hearing on the pending Motion, Germond testified that he could not recall whether he reviewed the entire hour of the recreation period in this case.  However, towards the end of his testimony Germond reaffirmed the view expressed in his Declaration, namely that his "normal procedure" would have been to review the whole hour but to download and preserve only those portions that he deemed to have evidentiary value.  See Germond Decl. at 2 ¶ 5 (Doc. No. 116-2).

[7] Butkiewicus was the DOC employee who ultimately prepared and signed off on the Incident Report for the September 18 incident.  See 9/18/2012 Incident Report (Doc. No. 97-2, Ex. K).

Dep. of David Butkiewicus at 152-53, 201-04 (Doc. No. 97-2, Ex. B).  At the hearing on the pending Motion, Butkiewicus testified that the interior surveillance camera that provided a partial view of the recreation yard would have had a clear view of the guard or guards monitoring the recreation period.  Thus, this angle would have allowed Butkiewicus to ascertain how many guards were monitoring the recreation period, what each guard's demeanor was, and how quickly the guards responded to the altercation— all information that could have been relevant to his investigation.  In sum, Butkiewicus's testimony at his Deposition and at the hearing on the pending Motion establishes that, had Butkiewicus adhered to his routine practice with respect to investigating the September 18, 2012, altercation,[8] Butkiewicus would have reviewed the video footage of the altercation captured by the interior camera, as well as reviewed the surveillance footage of correctional staff strip searching and restraining the inmates involved in the altercation prior to the recreation period.  Although Butkiewicus testified that he had the ability to ensure that any relevant portion of the video that he reviewed would be preserved, and in fact has done so in other cases, the only surveillance video that was preserved in relation to the incident on September 18, 2012, was the hour-long video described above.

Defendant Maldonado testified that he also would have had the authority to order that additional video footage be preserved, if he deemed it necessary.  At the hearing on the pending Motion, Maldonado testified that, during his tenure as the Warden of Northern, he would have a meeting every weekday morning in which staff would provide

---

[8] Butkiewicus cannot recall specifically whether he adhered to his routine practice in this case, but he also has not articulated any reason he might have failed to adhere to his routine practices with respect to this investigation.

brief overviews of every incident that had transpired in the facility in the previous 24 hours.  Thus, Maldonado would have heard about the September 18 altercation within 24 hours of that incident taking place.  Maldonado testified that he could have requested the video of the September 18 incident as soon as he was aware that it had occurred, and he could have ensured the preservation of any relevant video footage.  Maldonado also testified that, in his capacity as Warden, he would have reviewed the incident package prepared by his staff and could have requested further investigation or the preservation of additional video footage after his review, if he so chose.  In fact, Maldonado testified that he has directed staff to save additional video footage related to a particular incident on other occasions.  Maldonado testified that each staff member who reviewed the incident package for an altercation like the one on September 18, 2012, would have had the capacity to review and preserve additional video footage.

In addition to the testimony of specific DOC employees involved in the decisions surrounding the preservation (and non-preservation) of surveillance footage of the altercations at issue in this lawsuit, at the hearing on the pending Motion the defendants called Christine Whidden ("Whidden"), a longtime DOC employee they deemed qualified to speak to the records retention policies of the DOC (a Rule 30(b)(6) witness).  Whidden testified that preservation of surveillance footage of non-routine incidents, such as the altercation on September 18, 2012, are covered by the DOC's Records Retention Schedule Form RC-050.  In 2012, the relevant paragraph of that schedule provided that "audio/video security surveillance recordings at DOC facilities, regardless of format" would be retained for "4 years from date of recording, or until any pending action has been resolved, whichever is later."  DOC Form RC-050, series 21 (revised

13

02/2012).[9]  However, Whidden testified that the DOC does not interpret this policy to require them to preserve all video footage of an incident for four years; rather, the DOC interprets this policy to mean that any video footage that is deemed to be relevant by an investigating officer, and therefore downloaded and saved, must be retained for at least four years.  See also Decl. of Deputy Commissioner Monica Rinaldi ("Rinaldi Decl.") at 3 ¶ 10 (Doc. No. 116-3).  Whidden testified that she was not aware of a written policy that instructs investigating officers on what evidence is relevant and should be preserved; instead, the determination of what video footage should be preserved is left to the discretion of the investigating officer.  Surveillance footage that is not downloaded and saved is preserved for "approximately 30 days, at which point . . . it is automatically overwritten, and cannot be retrieved."  Rinaldi Decl. at 2 ¶ 5 (Doc. No. 116-3).  In other words, if a DOC employee does not act to download and save surveillance footage within 30 days[10] of the footage being recorded, the system recycles the footage and it is lost forever.

## III.   LEGAL STANDARD

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999).  A court's authority to impose sanctions for spoliation of evidence stems from two sources:

---

[9] This version of the document retention policy was submitted by defense counsel after the hearing, at the court's request.

[10] Whidden testified that the general practice of the DOC was to preserve surveillance footage for 30 days, but there is some evidence that surveillance footage is occasionally preserved for only 15-20 days, depending on the circumstances.  See Rinaldi Decl. at 2 ¶ 6 (Doc. No. 116-3).

first, if the spoliating party has violated a court order, the court may impose sanctions pursuant to Rule 37 of the Federal Rules of Civil Procedure, see West, 167 F.3d at 779; second, "[e]ven without a discovery order, a district court may impose sanctions for spoliation" as part of its "inherent power to control litigation," id. (citing Chambers v. NASCO, Inc., 501 U.S. 32, 43-45 (1991)).  When spoliation occurs, "a district court has broad discretion in crafting a proper sanction," but any sanction "should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party."  Id. (internal quotations and citation omitted).

Until December 1, 2015, any party seeking an adverse inference instruction as a remedy for spoliation of evidence had to establish:  "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."  Residential Funding Corp. v. DeGeorge Financial Corp., 306 F.3d 99, 107 (2d Cir. 2002) (internal quotations and citation omitted).  Effective December 1, 2015, however, a new procedural Rule went into effect regarding the obligations of parties to preserve electronically stored

15

information.[11]  <u>See</u> Fed. R. Civ. P. 37(e).[12]  The Advisory Committee Notes on section (e)(2) of the new Rule—which provides that an adverse inference instruction is only warranted when the court finds that a spoliating party "acted with the intent to deprive another party of the information's use in the litigation," Fed. R. Civ. P. 37(e)(2)—make clear that the new Rule 37 "rejects cases such as <u>Residential Funding Corp. v. DeGeorge Financial Corp.</u>, 306 F.3d 99 (2d Cir. 2002), that authorize the giving of adverse-inference instructions on a finding of negligence or gross negligence."  Fed. R. Civ. P. 37(e)(2) advisory committee's note to 2015 amendment.  In other words, the new Rule 37(e) overrules Second Circuit precedent on the question of what state of mind is sufficiently culpable to warrant an adverse inference instruction when electronically stored evidence is missing.

---

[11] There does not appear to be a question that the surveillance video footage at issue in Thomas's Motion for Sanctions falls within the definition of "electronically stored information" under Rule 37(e).  <u>See</u> Mem. in Supp. of Pl.'s Mot. for Sanctions at 10 n.3 (Doc. No. 97-1); Defs.' Opp. at 4 (Doc. No. 116) (arguing the new Rule 37(e) should apply to this case).

[12] The new Rule 37(e) provides:

If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

    (1)  upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

    (2)  only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

        (A)  presume that the lost information was unfavorable to the party;

        (B)  instruct the jury that it may or must presume the information was unfavorable to the party; or

        (C)  dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

When he transmitted the new Rule 37 to Congress, Chief Justice Roberts included an Order that provides, in pertinent part, that "the foregoing amendments to the Federal Rules of Civil Procedure shall take effect on December 1, 2015, and shall govern in all proceedings in civil cases thereafter commenced and, insofar as just and practicable, all proceedings then pending."[13]  2015 U.S. Order 0017.  Chief Justice Roberts's Order is consistent with the statute that governs transmission of new Rules of evidence or procedure to Congress, which provides that:

> the Supreme Court shall not require the application of [new Rules] to . . . proceedings then pending to the extent that, in the opinion of the court in which such proceedings are pending, the application of such rule in such proceedings would not be feasible or would work injustice, in which event the former rule applies.

28 U.S.C. § 2074(a).  Thus, for courts assessing whether to impose sanctions for a party's alleged spoliation of electronically stored information in a case filed before December 1, 2015, a preliminary question is whether it would be unjust or impracticable to apply the new version of Rule 37(e).

## IV.   DISCUSSION

There is no question that this action was pending long before the amendment to Rule 37(e) took effect on December 1, 2015, <u>see</u> Compl. (Doc. No. 1) (docketed May 23, 2013), which means that, before the court can consider the merits of Thomas's Motion for Sanctions, the court must determine whether it would be unjust or

---

[13] There does not appear to be any question that "proceeding" in this context means "case," such that what must be pending is the case itself, not a party's Motion.  <u>See, e.g.</u>, Fed. R. Civ. P. 86(a)(2) (noting that changes to the Rules need not be applied in "proceedings . . . in an action then pending" if "the court determines that applying them in a particular action would be infeasible or work an injustice"); Fed. R. Evid. 101(a), (b)(1) (noting that "[t]hese rules apply to proceedings in United States courts" and defining "civil case" as "a civil action or proceeding").

impracticable to apply the amended Rule 37(e) to these proceedings.  Because the

court concludes that it would be unjust to utilize the new Rule 37(e) in this proceeding,

the court will apply the traditional standard for assessing the need for spoliation

sanctions in this case.

In reaching this conclusion, the court notes that this action was filed more than

two-and-a-half years before the change to Rule 37(e) took effect.  See Compl. (Doc. No.

1) (docketed May 23, 2013).  For nearly two years of that period, Thomas was

prosecuting this action pro se.  See Order Appointing Pro Bono Counsel (Doc. No. 58)

(dated January 20, 2015).  If Thomas had been represented by counsel from the

beginning of this action, it is highly likely that the case would have proceeded more

quickly, and the issue of sanctions for alleged spoliation would have been resolved

before the amendment to Rule 37(e) went into effect.  Furthermore, all of the actions

and inaction relevant to resolution of the pending Motion transpired before the revisions

to Rule 37(e) went into effect, including the inmate altercations that gave rise to this

lawsuit, the alleged spoliation of video surveillance footage that captured those

incidents, and even the close of the discovery period for the lawsuit itself.  See Mem. in

Supp. of Pl.'s Mot. for Sanctions at 3-6 (Doc. No. 97-1) (noting that the altercations that

gave rise to the lawsuit occurred in 2012); Order (Doc. No. 69) (extending the deadline

for discovery to September 11, 2015).  Under these circumstances, the court concludes

that it would be unjust to utilize the new standard of the revised Rule 37(e) in this case.

See MacDraw, Inc. v. CIT Group Equipment Financing, Inc., 73 F.3d 1253, 1257 (2d

Cir. 1996) (finding that a district court could not have imposed sanctions under a revised

version of Rule 11 that took effect during the pendency of the case at issue "[b]ecause

18

the allegedly sanctionable conduct in this case occurred prior to the effective date of the 1993 amendments"). Thus, the court will apply the spoliation standard that was in use in this Circuit prior to December 1, 2015, in ruling on the pending Motion for Sanctions.

As noted in a preceding section, the spoliation standard in effect in this Circuit prior to December 1, 2015, is comprised of three elements: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." Residential Funding Corp., 306 F.3d at 107 (internal quotations and citation omitted). The court will analyze each of these elements in turn.

A.    Obligation to Preserve

Thomas asserts that a duty to preserve surveillance footage of each of the altercations at issue in this case stems from two separate sources: (1) the DOC's Records Retention Schedule, and (2) the common law.

With respect to the DOC's Records Retention Schedule: As noted above, the Records Retention Schedule in effect in 2012 provided that "audio/video security surveillance recordings at DOC facilities, regardless of format" should be preserved for "4 years from date of recording, or until any pending action has been resolved, whichever is later." DOC Form RC-050, series 21 (revised 02/2012). Notwithstanding the fact that the plain language of the Records Retention Schedule would appear to cover all surveillance footage captured by all cameras at all DOC facilities, various DOC employees have attested that the DOC understands this policy to govern only

19

surveillance footage that is downloaded and saved by an officer investigating an

incident.  See Rinaldi Decl. at 3 ¶ 10 (Doc. No. 116-3); Test. of Christine Whidden.  In

other words, it is the position of the DOC that, if an officer does not determine video

footage to be relevant, and therefore does not download the footage in question, there

is no written policy that governs the length of time the footage must be retained.  The

DOC further contends that any other interpretation of the Records Retention Policy—

i.e., an interpretation of the policy that would require the DOC to preserve all

surveillance recordings for four years—"would not be practicable" and "would make

searching for portions of a video that have evidentiary value nearly impossible."  Rinaldi

Decl. at 2 ¶ 8 (Doc. No. 116-3).  Finally, the DOC represented that there are not written

policies or standards that guide investigating officers in determining what surveillance

footage should be preserved.  See Test. of Christine Whidden; see also Rinaldi Decl. at

3 ¶ 12 (Doc. No. 116-3).

Although the court understands that saving all of the video footage from all of the

cameras operating at DOC facilities could be impracticable, the court concludes that the

interpretation of the Records Retention Policy advanced by the DOC is wholly

inconsistent with the text of that policy as written.  As noted above, the policy clearly

states that "audio/video security surveillance recordings at DOC facilities, regardless of

format" must be preserved for at least "4 years from date of recording."  DOC Form RC-

050, series 21 (revised 02/2012).  The policy does not state that DOC employees may

pick and choose among security surveillance recordings and preserve only that video

footage they deem to be relevant to the DOC's investigations, which is the interpretation

of the policy that the defendants ask the court to accept.  This interpretation of the

20

retention policy is particularly problematic given that the DOC has said it does not have written policies or standards that direct supervisors on how to determine what footage is relevant.

The DOC's argument that the decision as to what video footage should be retained lies in the unguided discretion of individual supervisors investigating incidents is contrary to the purpose of having a Records Retention Schedule, as well as inconsistent with the text of the policy itself.  If the DOC believes that the text of the Records Retention Schedule is impracticable or imposes an undue burden on the agency, its remedy is to change the Records Retention Schedule—not simply to decide that it is not bound by the mandates of the policy as written.  For these reasons, the court concludes that the DOC's Records Retention Schedule establishes an obligation to preserve all of the surveillance recordings at issue in this case.

Separately, the court also concludes that, under the common law, an obligation to preserve relevant surveillance footage attached no later than September 18, 2012. "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation."  Fujitsu Ltd. v. Federal Exp. Corp., 247 F.3d 423, 436 (2d Cir. 2001).  Whether a party should have known that particular evidence may be relevant to future litigation can be a complicated question, but at least one other court has found that a Department of Correction may be on notice of possible future litigation when an inmate is injured while in custody, because in "hundreds of . . . instances where inmates have been injured while in DOC custody, lawsuits by the injured inmates against the agency have invariably ensued."  Taylor v. City of New York, 293 F.R.D.

21

601, 610 (S.D.N.Y. 2013).

Although the court will not go so far as to say that DOC defendants are on notice of possible future litigation, and therefore subject to a common law duty to preserve, any time an inmate is injured while in custody, the court concludes that the duty to preserve in this case arose no later than September 18, 2012.  Several facts bolster this conclusion.  First, by September 18, 2012, at least defendants Maldonado and Butkiewicus were on notice that Thomas was not "in good standing" with the Bloods, and that he wanted to change his affiliation to the Crips.  See Compl. at 12 ¶¶ 4-6, 13 ¶ 8 (Doc. No. 1); Dep. of Luis Pagan at 26 (Doc. No. 97-2, Ex. A) (stating that on September 18, 2012, "administration knew that that day when Tye Thomas was coming outside involved in a Blood meeting, when they knew he was a Crip, it was a trick"); Email from David Butkiewicus to Edward Maldonado (Doc. No. 97-2, Ex. H) (dated 4/30/2012 and advising Maldonado that "Inmate Thomas himself is considered to be not in good standing with the blood affiliation"); 7/20/2012 Incident Report (Doc. No. 97-2, Ex. J) (noting that "intelligence suggests [Thomas] may be a participant in what has been labeled a 'renegade' pack of Bloods that do not recognize the authority of the established Blood sets"); 9/18/2012 Incident Report at 2 (Doc. No. 97-2, Ex. K) ("Inmate Thomas has recently been associated with a group of inmates that identify themselves as renegades.").  Second, the assault on Thomas on September 18 involved Thomas being attacked by a group of five inmates, two of whom managed to slip out of their restraints and to possess a makeshift weapon and an unauthorized medical device, respectively.  See 9/18/2012 Incident Report (Doc. No. 97-2, Ex. K).  Although not all incidents in which an inmate is injured may serve to put correctional defendants on

notice that there could be litigation forthcoming, an incident of this magnitude involving

so many violations of DOC policies at once should certainly have alerted the defendants

to the possibility that litigation could result.  See Taylor, 293 F.R.D. at 610 ("In

analogous situations where a party has knowledge that certain types of incidents tend to

trigger litigation, courts within the Second Circuit have found that a duty to preserve

relevant video footage may attach as soon as the triggering incident occurs and prior to

when a claim is filed." (collecting cases)).   Third, the DOC appears to have had actual

knowledge that the September 18, 2012, incident was serious and that the video of the

recreation period should be preserved, because a DOC employee did, in fact, download

and save a portion of the surveillance footage of that incident.  See NCI 12-1830 (video

of the altercation on September 18, 2012).[14]  Finally, Thomas filed grievances related to

the altercations that took place on September 18 and October 11 on October 17,

2012—29 days after the September incident took place.  See DOC Inmate

Administrative Remedy Forms (Doc. No. 97-2, Ex. Q)   These grievances put

defendants Maldonado and Butkiewicus[15] on additional notice that litigation could result

from the altercations on September 18 and October 11[16] and, because these

_____

[14] Any argument that Maldonado or Butkiewicus could not have preserved the entire hour of the recreation period due to space limitations is belied by the fact that a DOC employee saved 30 minutes of video of an empty recreation yard after the assault occurred.

[15] It is not clear whether Butkiewicus would have received a copy of the written grievance submitted by Thomas.  However, in the text of his grievance, Thomas states that he has "spoken to [his] unit manager (Captain Butkiewicus) about this incident verbally [and] have written him (no response)." DOC Inmate Administrative Remedy Form at 2, 4 (Doc. No. 97-2, Ex. Q); see also Compl. at 13 ¶ 8 (Doc. No. 1) (alleging that after the incident on September 18, 2012, Thomas "verbally requested a[n] affiliation change to Captain Butkiewicus during a routine tour").

[16] As noted above, Maldonado apparently interpreted Thomas's grievances as related to the DOC's restraint policy and denied them accordingly.  See DOC Inmate Administrative Remedy Form at 2, 4 (Doc. No. 97-2, Ex. Q).  However, the face of the grievances make clear that Thomas's issue is not with

grievances were filed within the period of time in which surveillance footage is generally still available at Northern, <u>see</u> Rinaldi Decl. at 2 ¶ 5 (Doc. No. 116-3) (30 days), they triggered a duty of investigation and preservation.

In addition to determining that a duty to preserve relevant evidence under the common law arose no later than September 18, 2012, the court must also assess the scope of the preservation duty. The court has little trouble concluding that the defendants who had control of the footage were under a duty to preserve the full videos of recreation periods in which Thomas was assaulted, as well as videos of the strip searches and restraint of inmates involved in the altercations prior to those recreation periods. These videos, if retained, could have allowed Thomas to assess (1) how various inmates were able to escape their restraints prior to assaulting him, (2) whether staff misconduct played a role in the ability of inmates to escape their restraints and to attend recreation with makeshift weapons, and (3) whether staff responded to the altercations in a timely and appropriate manner. In fact, Butkiewicus has tacitly acknowledged that the full videos of the recreation periods in which altercations took place, and the videos of strip searches prior to those recreation periods, are relevant to a complete understanding of how the incidents came to occur, because both Germond and Butkiewicus testified that it would have been their routine practice as supervising and investigating officers, respectively, to watch these videos in full to determine whether all "staff acted professional [sic] and in accordance with all governing directives, policies, and procedures." 9/18/2012 Incident Report (Doc. No. 97-2, Ex. K).

---

the restraint policy—<u>i.e.</u>, he is not arguing that he should no longer be restrained during recreation periods—but rather with the fact that other inmates were able to escape their own restraints on two separate occasions and assault him during recreation periods. <u>See</u> <u>id.</u>

The defendants' argument to the contrary, namely that they complied with their preservation duties because "the September 18, 2012, video which showed the incident in the recreation (rec) yard was in fact preserved, and provided to plaintiff's counsel," Defs.' Opp. at 3 (Doc. No. 116), "misconstrues the scope of 'all relevant evidence' under the reasonable anticipation of litigation standard," Taylor, 293 F.R.D. at 611. "All relevant evidence" means all evidence that could be relevant to litigation that the DOC should have known could be forthcoming, and not just evidence that is relevant to the DOC's internal investigation into an incident. These two categories may overlap, but they are not coterminous; the question of what "surveillance footage [is] deemed relevant to the DOC's investigation of the use of force and inmate on inmate assault is separate and apart, and also less broad, as the inquiry about what was 'potentially relevant' to a lawsuit against the DOC for failure to protect." Id. Put another way, when determining what video footage, if any, should be preserved in relation to the altercations at issue in this case, the obligation to preserve all relevant evidence required the defendants who had control of the footage not just to ascertain and preserve the evidence that is relevant for their purposes, but also the evidence that could be relevant for Thomas's purposes. By preserving only a portion of the surveillance footage of just one of the recreation periods in which Thomas was assaulted, this duty was breached.

The court is cognizant of the fact that the obligation to preserve is attendant only upon "the party having control over the evidence . . . at the time it was destroyed." Residential Funding Corp., 306 F.3d at 107. On the basis of the foregoing discussion, the court concludes that, of the defendants named in this lawsuit, only Maldonado and

Butkiewicus had control of, and the obligation to preserve, any of the surveillance footage related to the incidents at issue in this lawsuit.  More specifically, the court finds that Maldonado had an obligation to preserve all of the surveillance footage at issue, and Butkiewicus had an obligation to preserve all of the surveillance footage related to incidents for which he was the investigating officer, i.e., the officer who ultimately signed off on the Incident Report for a given altercation.  Because there is no evidence that either defendant Gorman or defendant Aldi had control over any of the surveillance footage that was not preserved, the court concludes that neither defendant Gorman nor defendant Aldi had an obligation to preserve that footage and that it would not be appropriate to direct sanctions against them.

B.   Culpable State of Mind

As noted previously, the court has concluded that it would be unjust to apply the standard of revised Rule 37(e) to this case, which was pending long before the changes to Rule 37 took effect on December 1, 2015.  Thus, the court will use the familiar standard of Residential Funding Corp. to ascertain whether Maldonado or Butkiewicus had a sufficiently culpable state of mind such that sanctions for spoliation of evidence may be appropriate.  Under Residential Funding Corp., "the 'culpable state of mind' factor is satisfied by a showing that the evidence was destroyed 'knowingly, even if without intent to breach a duty to preserve it, or negligently.'"  Residential Funding Corp., 306 F.3d at 108 (quoting Byrnie v. Town of Cromwell, 243 F.3d 93, 109 (2d Cir. 2001)).

"As multiple other courts have recognized, 'once the duty to preserve attaches, any destruction of relevant evidence is, at a minimum, negligent.'"  Taylor, 293 F.R.D. at

612 (quoting Slovin v. Target Corp., No. 12 CV 863 (HB), 2013 WL 840865, at *4

(S.D.N.Y. March 7, 2013)); see also Zubulake v. UBS Warburg LLC, 220 F.R.D. 212,

220 (S.D.N.Y. 2003) (noting that destruction of documents a defendant has a duty to

preserve is negligent).  Thus, Maldonado and Butkiewicus were negligent both because

they violated their duty to preserve as established by the DOC's Records Retention

Schedule, as well as their duty to preserve under the common law after the moment on

which the duty to preserve attached, i.e., no later than September 18, 2012.  This

negligence exhibits a state of mind sufficiently culpable to support the imposition of an

adverse inference instruction under the standard of Residential Funding Corp.

Furthermore, the court finds that the failure to preserve video surveillance

footage of the altercations on September 18 and October 11 is grossly negligent.  By

the time the altercation on September 18, 2012, took place, Maldonado and Butkiewicus

had been aware that Thomas was not in good standing with the Bloods for nearly six

months.  See Email from David Butkiewicus to Edward Maldonado (Doc. No. 97-2, Ex.

H) (dated 4/30/2012 and advising that "Inmate Thomas himself is considered to be not

in good standing with the blood affiliation"); Compl. at 12 ¶ 6 (Doc. No. 1) (alleging that

"on 4-18-12 [Thomas] wrote to Warden Maldonado and informed the Warden of his no

longer being a Blood, but that he was a Crip formally and requested a[n] affiliation and

rec change because he feared for his safety").  The altercation itself involved multiple,

serious breaches of DOC policy, including inmates slipping their restraints and

possessing weapons and unauthorized medical devices.  The preserved video of the

altercation on September 18, 2012, makes clear that that there was a real possibility

Thomas could have been severely injured, or perhaps even killed, in the attack.

27

Furthermore, Thomas filed grievances related to the fact that other inmates were able to slip out of their restraints in the September 18, 2012, and October 11, 2012, altercations within the 30 day period in which Northern retains surveillance footage. See DOC Inmate Administrative Remedy Form at 2 (Doc. No. 97-2, Ex. Q); Rinaldi Decl. at 2 ¶ 5 (Doc. No. 116-3). Despite these facts, there is no evidence that either Maldonado or Butkiewicus, both of whom testified they had the capacity to review and preserve surveillance footage of incidents, made any effort to preserve relevant video footage for Thomas's use either immediately following the incidents themselves or after Thomas filed grievances related to these incidents that unquestionably put them on notice that litigation could result from these altercations. This failure is deeply troubling and, under the circumstances, rises to the level of gross negligence.

C.     Relevance

The final element that a plaintiff must establish in order to warrant the imposition of sanctions for spoliation is that "the unavailable evidence is 'relevant' to its claims or defenses." Residential Funding Corp., 306 F.3d at 108. In this context, relevant means that "the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction." Id. at 109 (internal quotations, alterations, and citation omitted). Destruction of evidence in bad faith or under circumstances that constitute gross negligence may, under some circumstances, "suffice, standing alone, to support a finding that the evidence was unfavorable to the" spoliating party. Id. Where evidence is destroyed due to simple negligence, however, "the party moving for sanctions bears the burden of establishing

that the destroyed evidence would have been favorable to his claims." Taylor, 293
F.R.D. at 613.  In assessing relevance, the court "must take care not to hold the
prejudiced party to too strict a standard of proof . . . because doing so would subvert the
purposes of the adverse inference, and would allow parties who have destroyed
evidence to profit from that destruction."  Residential Funding Corp., 306 F.3d at 109
(internal quotations, alterations, and citation omitted).  Nevertheless, in order for the
imposition of sanctions to be appropriate, the court must be persuaded that "the
destroyed evidence would have been relevant to the contested issue."  Kronisch v.
United States, 150 F.3d 112, 127 (2d Cir. 1998).

Prior sections of this Ruling have established that (1) pursuant to the DOC's
Records Retention Schedule, Maldonado and Butkiewicus had a duty to preserve all
surveillance footage related to the altercations at issue in this lawsuit; (2) even in the
absence of the DOC's retention policy, Maldonado and Butkiewicus had a duty to
preserve under the common law that attached no later than September 18, 2012; (3) the
failure to preserve evidence after the duty to preserve attached was negligent; and (4)
the failure to preserve surveillance footage of the incidents on September 18 and
October 11 was grossly negligent.  Given these conclusions, the court will divide its
analysis of the relevance of the missing surveillance footage into three parts, organized
by the dates of the altercations for which footage is missing:  (1) surveillance footage of
the incident on January 18, 2012; (2) surveillance footage of the incidents on April 16,
2012, July 3, 2012, and July 20, 2012; and (3) surveillance footage of the incidents on
September 18, 2012, and October 11, 2012.

      1.     January 18, 2012

Although the parties do not appear to mention it in their briefing, at the hearing on the pending Motion Thomas elicited brief testimony from Butkiewicus about surveillance video of the January 18, 2012, incident that may have been downloaded by an investigating officer and subsequently lost.  Thomas cited a Supervisor/Video Recording Review form and a Contraband/Physical Evidence Tag and Chain of Custody form that relate to a video labeled NCI-12-0160 on "compact disc," which the comments indicate is a "recording of the 2 East, North Recreation yard" that shows the altercation between Thomas, Ellerbe, and two other inmates.  DOC Supervisor Video Recording Review for Unit Tracking Number NCI 12 0160.  If this video is what the form suggests it is, i.e., downloaded and preserved surveillance footage of the altercation involving Thomas and three other inmates, the DOC was obligated even by its preferred interpretation of its own policies to preserve the video for four years.  See DOC Form RC-050, series 21 (revised 02/2012); Rinaldi Decl. at 3 ¶ 10 (Doc. No. 116-3); Test. of Christine Whidden.  However, Butkiewicus's testimony and a few passing references to this video in Thomas's Exhibits appended to the pending Motion indicate that this video has been lost.  See Email from Tadhg Dooley to DeAnn Varunes (Doc. No. 97-2, Ex. M) ("We are aware that you have previously reported that the stationary video of the 1/18/12 incident (NCI-12-160) has been misplaced."); Email from DeAnn Varunes to Tadhg Dooley (Doc. No. 97-2, Ex. M) ("[I]t is my understanding that NCI-12-160 cannot be located.").

Although Maldonado and Butkiewicus were under an obligation to preserve the surveillance footage of the January 18, 2012, altercation pursuant to the DOC's own policies, and although their apparent failure to do so "is, at a minimum, negligent,"

Taylor, 293 F.R.D. at 612 (collecting cases), the court concludes that an adverse inference instruction is not warranted with respect to the failure to preserve surveillance footage of this incident because Thomas has failed to carry his burden of establishing that the missing footage is "relevant to the contested issue," Kronisch, 150 F.3d at 127. Unlike the other incidents at issue in this litigation, the altercation on January 18, 2012, involved Thomas and another inmate, Ellerbe, in a fight with two members of the Bloods. See 1/18/2012 Incident Report (Doc. No. 97-2, Ex. F). In that altercation, the inmate who slipped out of his restraints and was determined to have possessed a makeshift weapon was Ellerbe—the inmate who came to Thomas's defense. See id.; see also Compl. at 12 ¶¶ 2-3 (Doc. No. 1). Under these circumstances, it is hard to understand how surveillance footage of the altercation, which, as far as Thomas was concerned, "consisted of an exchange of kicks" with the two Blood-affiliated inmates, 1/18/2012 Incident Report (Doc. No. 97-2, Ex. F), would be relevant to the claims Thomas is pursuing at trial, namely that the defendants were deliberately indifferent to his safety and failed to protect him. Because Thomas has failed to offer a theory or evidence that establishes the relevance of the surveillance video of the altercation on January 18, 2012, to his claims in this lawsuit, the court denies Thomas's request for sanctions related to spoliation of that video.

      2.     April 16, 2012, July 3, 2012, and July 20, 2012

In previous sections of this Ruling, the court concluded that there was an obligation to preserve surveillance video of these incidents pursuant to the DOC's retention policies and that, in the alternative, Maldonado and sometimes Butkiewicus had an obligation to preserve relevant surveillance video under the common law that

31

attached no later than September 18, 2012.  The court also concluded that any failure to preserve video footage of the April 16, 2012, July 3, 2012, and July 20, 2012 incidents was merely negligent.  As noted above, if evidence is destroyed due to a party's negligence, the burden is on the party seeking sanctions to "adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction." Residential Funding Corp., 306 F.3d at 109 (internal quotations, alterations, and citation omitted).

Thomas has failed to carry his burden of establishing relevance with respect to surveillance footage of the incidents on April 16, 2012, July 3, 2012, and July 20, 2012. In contrast to the other altercations at issue in this lawsuit, the incidents on April 16, 2012, July 3, 2012, and July 20, 2012, took place inside cells located in Northern's housing units.  See 4/16/2012 Incident Report (Doc. No. 97-2, Ex. G); 7/3/2012 Incident Report (Doc. No. 97-2, Ex. I); 7/20/2012 Incident Report (Doc. No. 97-2, Ex. J).  The uncontroverted testimony of Butkiewicus at the hearing on the pending Motion was that the doors of housing cells at Northern are made of steel, and that the surveillance cameras positioned in the hallway do not capture what is happening inside the cells. Thomas has offered no theory, let alone evidence, that supports the relevance of surveillance footage of the hallway outside a cell while an altercation is taking place inside the cell.  See Mem. in Supp. of Pl.'s Mot. for Sanctions at 20-21 (Doc. No. 97-1). For these reasons, the court concludes that Thomas has failed to carry his burden of establishing the relevance of surveillance footage of the incidents on April 16, July 3, and July 20.

3.      September 18, 2012, and October 11, 2012

Finally, the court must assess the possible relevance of surveillance footage of the altercations on September 18, 2012, and October 11, 2012.  Prior sections of this Ruling have concluded that both the retention policies of the DOC and the common law established an obligation to preserve relevant evidence at the time of each of these altercations, and that the failure to preserve surveillance footage related to these incidents constituted gross negligence.  In contrast to simple negligence, a finding of gross negligence, standing alone, may "support a finding that the evidence was unfavorable to the grossly negligent party."  Residential Funding Corp., 306 F.3d at 109. The court concludes that this is the case here.  In other words, the evidence of Maldonado's and Butkiewicus's gross negligence is "sufficient to permit a jury to conclude that the missing evidence is favorable to the [moving] party."  Id.

In the alternative, the court concludes that Thomas has adduced sufficient evidence from which the court could conclude that the videos at issue were relevant to his claims in this lawsuit.  Thomas has produced extensive testimony from Luis Pagan, the inmate who led the assault on Thomas on September 18, 2012, regarding that assault.  Most importantly, Pagan testified that he showed Thomas that he had slipped out of his restraints approximately 40 minutes before the assault occurred, in full view of the guard monitoring the recreation period and the surveillance camera trained on the yard.  See Dep. of Luis Pagan at 27-28, 50 (Doc. No. 97-2, Ex. A).  Pagan's actions took place during part of the recreation period that was not preserved.  As Thomas notes, if the video had been preserved and, in fact, depicted the scene Pagan recounts, the video would have provided important corroboration of a key piece of Pagan's

33

testimony.  Pagan's testimony establishes the relevance of the surveillance footage for the full hour of the recreation period.  Similarly, the fact that Pagan was able to enter the recreation yard with a makeshift weapon on his person and subsequently slip out of his restraints establishes the relevance of surveillance footage of the search and restraint of Pagan prior to the recreation period.

The evidence of the relevance of the video of the altercation on October 11, 2012, is perhaps not as clear as with the September 18, 2012, incident, but the court is nonetheless persuaded that Thomas has established relevance for that surveillance footage, also.  The incident on October 11 took place less than a month after the altercation on September 18, and also involved an inmate who was able to slip out of his restraints prior to assaulting Thomas.  See 10/11/2012 Incident Report (Doc. No. 97-2, Ex. L).  Furthermore, Thomas submitted a grievance related to the altercation on October 11 within a week of that incident taking place.  See DOC Inmate Administrative Remedy Form at 4 (Doc. No. 97-2, Ex. Q).  Maldonado had several weeks in which he could have investigated Thomas's grievance, reviewed surveillance video of the incident on October 11, and directed that video be preserved in light of the fact that it should have been foreseeable that litigation could result.  The fact that Maldonado apparently failed to do so is sufficient circumstantial evidence that the contents of the spoliated video would have been relevant to Thomas's claims in this case.  See Residential Funding Corp., 306 F.3d at 109.

To summarize, the court finds as follows:  (1) The DOC's Records Retention Schedule creates an obligation to preserve for four years any surveillance videos.  In addition, Maldonado and Butkiewicus had an obligation to preserve any relevant

34

evidence once they "should have known that the evidence may be relevant to future litigation." Fujitsu Ltd., 247 F.3d at 436.  The date on which Maldonado and Butkiewicus should have known that litigation could result from the altercations at issue in this lawsuit is no later than September 18, 2012.  (2) The failure to preserve surveillance footage of incidents prior to September 18, 2012, was negligent.  The failure to preserve surveillance footage of the incidents on September 18, 2012, and October 11, 2012, was grossly negligent.  (3) Thomas has failed to carry his burden of establishing that surveillance footage of the incidents on January 18, 2012, April 16, 2012, July 3, 2012, and July 20, 2012, was relevant to his claims in this lawsuit "such that a reasonable trier of fact could find that it would support that claim or defense." Residential Funding Corp., 306 F.3d at 107.  However, the manner and fact of the gross negligence in failing to preserve surveillance footage of the incidents on September 18, 2012, and October 11, 2012, standing alone, supports a finding that the spoliated evidence "was unfavorable to the grossly negligent party." Id. at 109.  In addition, Thomas has adduced sufficient evidence from which the court could, and does, conclude that the spoliated surveillance footage of these incidents was relevant to his claims in this case.

D.   Sanctions

Because the court has concluded that Maldonado and Butkiewicus spoliated relevant evidence pertaining to the September 18, 2012, and October 11, 2012, altercations, the court must determine an appropriate remedy.  As noted above, the court has broad discretion in crafting a proper sanction, but "the applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying

the spoliation doctrine." <u>West</u>, 167 F.3d at 779.  With respect to the spoliation of surveillance footage related to the incidents of September 18, 2012, and October 11, 2012—the two incidents for which the court has concluded that Maldonado and Butkiewicus did, in fact, spoliate relevant evidence—Thomas has asked the court for a mandatory adverse inference instruction and reasonable attorney's fees.  <u>See</u> Mem. in Supp. of Pl.'s Mot. for Sanctions at 22 (Doc. No. 97-1).  For the reasons that follow, the court will grant Thomas's request for a mandatory adverse inference instruction with respect to spoliation of footage of the September 18, 2012, strip searches and altercation, and will impose a permissive adverse inference instruction with respect to spoliation of footage of the October 11, 2012, strip searches and altercation.  The instruction with respect to the spoliation of footage of the September 18 incident will be directed against Maldonado and Butkiewicus, and the instruction with respect to the spoliation of footage of the October 11 incident will be directed against Maldonado alone.  The court will also consider granting Thomas's request for reasonable fees associated with prosecuting this Motion.

      1.      Mandatory Inference for Spoliation of September 18 Footage

The court is well aware that giving the jury a mandatory adverse inference instruction in relation to the spoliation of the surveillance footage of September 18, 2012, is a serious sanction indeed.  However, the court is convinced that no other form of relief, including a permissive adverse inference instruction, would adequately serve the "prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." <u>West</u>, 167 F.3d at 779.  For one thing, permissive inference instructions are not necessarily sanctions that necessitate a court finding that the <u>Residential Funding Corp.</u>

36

test has been met.  See Mali v. Federal Ins. Co., 720 F.3d 387, 392-93 (2d Cir. 2013) (noting that some adverse inference instructions "[are] not punishment," but rather "an explanation to the jury of its fact-finding powers"); Singh v. Penske Truck Leasing Co., L.P., No. 13 Civ. 1860, 2015 WL 802994, at *7 (S.D.N.Y. Feb. 26, 2015) ("As the Second Circuit has made clear, a permissive (as opposed to mandatory) adverse inference instruction does not necessarily reflect a sanction, and its delivery to a jury does not require the same findings necessary to impose a spoliation sanction.").

In addition, the court has concluded that the failure to preserve the surveillance footage of the September 18, 2012, incident was grossly negligent.  It is the opinion of this court that the culpability of a grossly negligent state of mind requires a sanction that is correspondingly more severe than would be necessary if the failure to preserve the surveillance footage amounted to run-of-the-mill negligence.

Furthermore, Thomas has produced evidence that the spoliated footage of the September 18, 2012, incident would have shown an inmate demonstrating to Thomas that he was no longer restrained, and correctional staff failing to intervene to remedy that fact for 40 minutes.  See Dep. of Luis Pagan at 27-28, 50 (Doc. No. 97-2, Ex. A). Surveillance footage consistent with Pagan's testimony would not only provide additional evidentiary support for Thomas's claims in this case, it would corroborate the testimony of one of Thomas's key witnesses, likely making him seem more credible. Under these circumstances, a permissive inference instruction related to the missing evidence simply would not "restore 'the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.'" West, 167 F.3d at 779 (quoting Kronisch, 150 F.3d at 126).

37

Finally, the court concludes that a severe sanction is necessary to "deter parties from engaging in spoliation" in this case.  Id.  The court is troubled by the testimony of several defendants and non-defendant DOC employees that expresses the view that they only have the obligation to preserve the evidence that an individual supervisor, who is not guided by written policies or standards, determines is relevant to his investigation or inquiry.  See, e.g., Rinaldi Decl. at 3 ¶ 12 (Doc. No. 116-3) ("There is no DOC policy of which I am aware that would require a supervisor to download and save anything more than the supervisor determines would be relevant to the inquiry.").  As noted in a previous section, the evidence that is relevant for the DOC's purposes may not be the same as the evidence that is relevant for a plaintiff's purposes in subsequent litigation that the DOC knew or should have known was likely to result from an incident.  The court hopes that a mandatory adverse inference instruction in this case will serve to remind the defendants, and perhaps the DOC, that they have a legal obligation to preserve relevant evidence, and to deter them from spoliating such evidence in the future.  At a minimum, the court is confident that a mandatory adverse inference instruction will "place the risk of an erroneous judgment on the party who wrongfully created the risk," West, 167 F.3d at 779, and that no other sanction would adequately achieve this and the other purposes of spoliation sanctions in this case.

However, in recognition of the fact that sanctions are most appropriately directed at "the party having control over the evidence" who had "an obligation to preserve it at the time it was destroyed," Residential Funding Corp., 306 F.3d at 107, the court will direct the mandatory adverse inference instruction against defendants Butkiewicus and Maldonado, as the evidence presented by the parties shows that these two defendants

(1) would have been aware of the altercation on September 18, 2012, within 24 hours of that event taking place; (2) had standard practices of reviewing relevant evidence of inmate altercations; (3) had the capacity to order the preservation of relevant evidence, including surveillance videos; and (4) on at least one unrelated occasion, had in fact ordered the preservation of additional video footage that captured an inmate altercation. In other words, the evidence establishes that defendants Maldonado and Butkiewicus had control over the video footage that they were under a duty to preserve, and nonetheless failed to preserve.  In contrast, there is no evidence that either defendant Gorman or defendant Aldi had control over the evidence that was spoliated in this case and, as a result, the court concludes that an adverse inference instruction against these two defendants would not be appropriate.

The court will craft the specific language of the mandatory adverse inference instruction at the charging conference, but the court anticipates that the instruction will reflect the fact that, because defendants Maldonado and Butkiewicus were grossly negligent in failing to preserve footage of the strip searches of inmates and full hour of recreation on September 18, 2012, the jury must infer that the missing video footage would have corroborated the testimony of Luis Pagan.

2.    Permissive Inference for Spoliation of October 11 Footage

In contrast to the footage pertaining to the incident on September 18, 2012, Thomas has introduced little evidence that establishes the content of the missing footage of the October 11, 2012, altercation, and how that missing footage would have been relevant to the claims he presses in this case.  Although the court has concluded that the evidence Thomas has presented is sufficient to establish the relevance of the

missing footage of the October 11 altercation, in the absence of much evidence about what the missing footage of this incident would have shown, the court concludes that a mandatory inference instruction would be too severe a sanction. The "prophylactic, punitive, and remedial rationales underlying the spoliation doctrine," West, 167 F.3d at 779, can be adequately served by a permissive inference instruction that will instruct that jury that they may infer, but do not have to infer, that the fact that Maldonado[17] failed to preserve surveillance footage of the October 11 strip searches and altercation means that the evidence would have been favorable to Thomas.

       3.    Fees

In addition to granting Thomas's Motion for a mandatory adverse inference instruction for spoliation of surveillance footage related to the September 18 incident and a permissive adverse inference instruction for spoliation of the surveillance footage related to the October 11 incident, the court will consider the award of reasonable attorney's fees. "Such a monetary award" may be "appropriate because it serves the remedial purpose of making Plaintiff whole for the costs he has incurred as a result of Defendants' spoliation." Taylor, 293 F.R.D. at 616 (collecting cases).

## V.   CONCLUSION

For the foregoing reasons, Thomas's Motion for Sanctions (Doc. No. 97) is **GRANTED IN PART** AND **DENIED IN PART**. The court grants Thomas's request for a

---

[17] As noted above, Maldonado testified that he was generally aware of incidents that took place in the prison within 24 hours of them occurring and that, as Warden, he had the power to order that surveillance footage be preserved. Thus, Maldonado had both control of, and an obligation to preserve, the video footage of the October 11 incident. It is therefore appropriate to direct sanctions for the spoliation of that evidence against Maldonado. In contrast, there is no evidence that any of the other defendants had control of the footage of the October 11 incident and, as a result, the court concludes that directing an adverse inference instruction against those defendants is not appropriate.

mandatory adverse inference instruction related to the spoliation of surveillance footage outside the cell and of the recreation yard on September 18, 2012, and grants a permissive adverse inference instruction for the spoliation of surveillance footage outside the cell and of the recreation yard on October 11, 2012.  The court denies Thomas's request for a permissive adverse inference instruction related to the alleged spoliation of surveillance footage of the altercations on January 18, 2012, April 16, 2012, July 3, 2012, and July 20, 2012.  The court will craft the specific instructions at the charging conference.

Additionally, the court will consider Thomas's request for an award of reasonable attorneys' fees for bringing the Motion for Sanctions.  Counsel for Thomas should submit a bill that outlines the fees attributable to prosecuting this Motion for assessment by the Court, as well as provide a copy of the bill to counsel for the defendants.

**SO ORDERED**.

Dated at New Haven, Connecticut this 29th day of April, 2016.


 /s/ Janet C. Hall
Janet C. Hall
United States District Judge